IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-00809-WDM-CBS

CHARLES WHALEN,
       Plaintiff,
v.

WILEY- Former Warden,
RIOS - Warden,
GUNJA - Associate Warden (Former),
HOLT - Associate Warden (Former),
ORTEGA - Captain (Former),
THREE UNKNOWN S.I.S. OFFICERS (Former),
ONE UNKNOWN S.H.U. LIEUTENANT (Former),
MASOPUST - S.H.U. Lieutenant (Former),
FIVE UNKNOWN UNIT MANAGERS (Former),
FIVE UNKNOWN CASE MANAGERS (Former), and
FIVE UNKNOWN COUNSELORS (Former),
       Defendants.
_____

ORDER TO SUPPLEMENT JULY 16, 2007 RECOMMENDATION
_____

Magistrate Judge Craig B. Shaffer

       This civil action comes before the court on the Recommendation of United States

Magistrate Judge dated July 16, 2007 (doc. # 61).  The court indicated in footnotes 4 and

5 of the Recommendation that it had attached two unpublished cases to the

Recommendation.   However, those two cases were in fact not attached to the

Recommendation.  Accordingly, the court hereby attaches the two unpublished cases to

this Order as a supplement to the Recommendation.

       DATED at Denver, Colorado, this 23rd day of July, 2007.

                                                 BY THE COURT:


                                                     s/Craig B. Shaffer
                                                 United States Magistrate Judge



191 Fed.Appx. 639                                                                                                          Page 1
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

**H**

Jordan v. Federal Bureau of Prisons
C.A.10 (Colo.),2006.
This case was not selected for publication in the Federal Reporter.Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)
United States Court of Appeals,Tenth Circuit.
Mark JORDAN, Plaintiff-Appellant,
v.
FEDERAL BUREAU OF PRISONS; R.E. Holt; Lt. Fels; M. Pugh, Warden, USP-ADX; J. Gunja; A. Childs; Robert A. Hood, Defendants-Appellees.
**No. 04-1104.**

July 25, 2006.

**Background:** Inmate brought a *Bivens* action against officials of the Federal Bureau of Prisons, alleging that the conditions and duration of his nearly five-year administrative detention, together with federal prison regulations, created a liberty interest triggering due process protections which prison officials violated. The United States District Court for the District of Colorado granted summary judgment against the inmate, and he appealed.

**Holdings:** The Court of Appeals, Wade Brorby, Circuit Judge, amending and superseding an earlier opinion, 2006 WL 1587456, held that:

(1) conditions and restrictions to which inmate was subjected during administrative detention did not impose an atypical and significant hardship;

(2) inmate's placement in administrative detention for a period of nearly five years did not implicate a liberty interest protected by due process;

(3) regulation addressing reviews of inmates in administrative detention did not create any liberty interest triggering due process protections violated by prison officials; and

(4) inmate was not held in administrative detention in retaliation for exercising protected rights.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ☞4826**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)11 Imprisonment and Incidents Thereof
            92k4826 k. Segregation. Most Cited Cases
   (Formerly 92k272(2))

**Prisons 310 ☞13(4)**

310 Prisons
   310k13 Custody and Control of Prisoners
      310k13(4) k. Particular Violations, Punishments, and Deprivations; Use of Force. Most Cited Cases
Conditions and restrictions to which inmate was subjected during administrative detention, including one less social call and up to seven hours less recreation time than general population inmates, did not impose an atypical and significant hardship so as to implicate a liberty interest protected by due process; when conditions or restrictions the inmate experienced differed from those in the general or population or others in administrative detention, the differences stemmed from temporary disciplinary measures resulting from his infractions while in administrative detention. U.S.C.A. Const.Amend. 5.

**[2] Constitutional Law 92 ☞4826**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)11 Imprisonment and Incidents Thereof
            92k4826 k. Segregation. Most Cited Cases
   (Formerly 92k272(2))

**Prisons 310 ☞13(5)**

191 Fed.Appx. 639                                                                                         Page 2
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(5) k. Segregation and Solitary Confinement; Classification. Most Cited Cases
Inmate's placement in administrative detention for a period of nearly five years did not implicate a liberty interest protected by due process; the detention was the result of a justified, ongoing investigation of a murder within the prison, of which the inmate was a suspect, and officials were aware of his significant history of violent and disruptive behavior. U.S.C.A. Const.Amend. 5.

**[3] Constitutional Law 92 🗝4826**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)11 Imprisonment and Incidents Thereof
                92k4826 k. Segregation. Most Cited Cases
    (Formerly 92k272(2))

**Prisons 310 🗝13(6)**

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(6) k. Disciplinary, Classification, and Grievance Proceedings; Composition of Tribunal. Most Cited Cases
Regulation requiring informal weekly reviews of an inmate in administrative detention as a result of the inmate's holdover status did not create any liberty interest triggering due process protections violated by prison officials; the court had previously held that the regulation created no liberty interest, and in any event, the inmate received the requisite informal, nonadversary evidentiary review during a criminal investigation into a murder, which had resulted in the detention. U.S.C.A. Const.Amend. 5; 28 C.F.R. § 541.22(c).

**[4] Prisons 310 🗝13(5)**

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(5) k. Segregation and Solitary Confinement; Classification. Most Cited Cases

Inmate's refusal to confess to the murder of another prisoner or to implicate another individual was not a "but for" cause of his administrative detention, thus defeating his retaliation claim; the detention was based on a pending criminal investigation into the crime and justified security concerns.

Peter J. Krumholz, Davis, Graham & Stubbs, Denver, CO, for Plaintiff-Appellant.
***641** Mark Jordan, Florence, CO, pro se.
Joe Benedict Garcia, Kathleen L. Torres, Office of the United States Attorney, Denver, CO, for Defendants-Appellees.

Before HARTZ, Circuit Judge, and MCWILLIAMS and BRORBY, Senior Circuit Judges.

**ORDER**

****1** This matter is before the court on Appellees' unopposed petition for a panel rehearing of the order and judgment issued June 12, 2006. We deny the rehearing petition in part and grant in part.

The petition presents two requests for relief. The panel denies the request for publication of the opinion. The panel grants the request to amend the order and judgment to refer to a *Bivens* action rather than a § 1983 action.

The original order and judgment is, accordingly, vacated and replaced with the amended Order and Judgment attached to this Order.

**ORDER AND JUDGMENT** [FN*]

> [FN*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Appellant Mark Jordan appeals the district court's grant of summary judgment in favor of the Appellees, officials of the Federal Bureau of Prisons,[FN1] on his *Bivens* [FN2] action alleging the conditions and dura-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639                                                                                          Page 3
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

tion of his five-year administrative detention, together with the federal prison regulations in 28 C.F.R. § 541.22, created a liberty interest triggering procedural due process protections which the prison officials violated. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

> FN1. All claims against Defendants Kathleen Hawk, G. Hershberger, and the Federal Bureau of Prisons were dismissed in prior orders and are not part of this appeal.

> FN2. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

## I. Disputed and Undisputed Factual Background

We begin by reviewing the considerable record of evidence on which the district court granted summary judgment, in order to ascertain, under the applicable standard of review, whether disputed material facts exist prohibiting summary judgment resolution. As a preliminary consideration, we note that while we must view the evidence in the light most favorable to Mr. Jordan as the nonmoving party, he offers almost no evidence to counter the overwhelming evidence offered by prison officials rebutting the allegations in his verified complaint, or to otherwise respond to the particularized facts in support of their motion for summary judgment.

To begin, during the period in question, it is undisputed Mr. Jordan was serving a seventy-eight-month sentence for one count of armed bank robbery and a 318-month sentence for another count of armed bank robbery and possession of a firearm in relation to a crime of violence. From June 1999 to June 4, 2004, Mr. Jordan was imprisoned at the Federal Correctional Complex in Florence, Colorado, operated by the United States Bureau of Prisons. Prior to his confinement at Florence, Mr. Jordan was confined at federal prisons in Allenwood, Pennsylvania, and Atlanta, Georgia, where he was classified as a high security risk based on his significant history of violent and disruptive **\*642** behavior stemming from numerous infractions, including threatening bodily harm.

## A. Dry Cell Placement

On June 3, 1999, while at the Florence prison, officials issued an order placing Mr. Jordan in a dry cell after he was accused that day of murdering another inmate with an eleven-inch sharpened piece of metal while in the main recreation yard. *See Jordan v. Hood,* 117 Fed.Appx. 31, 32 (10th Cir.2004) (unpublished op.); *United States v. Jordan,* 2005 WL 513501, at \*1 (D.Colo. March 3, 2005) (unpublished op.). In his verified complaint, Mr. Jordan alleged he remained in the dry cell for ten days, from June 3 to June 13, 1999, and received neither notice of the reasons for his dry cell placement nor a hearing on his confinement. Prison officials contradicted the duration of Mr. Jordan's confinement by declaration and submission of documentary evidence showing Mr. Jordan remained in the dry cell less than a day, from approximately 3:00 p.m. until 7:38 p.m., at which time officials issued an order transferring him to administrative detention pending an investigation of his assault on another person and for security reasons. Prison records show Mr. Jordan was transferred that evening to Cell A-106, which is not a dry or holding cell, but a cell in the special housing unit for administrative detentions; these records also show on each of his ten days in Cell A-106 the times when he ate, exercised, showered, and received physician's assistant visits. In an attempt to rebut the daily prison records showing his ten-day placement in Cell A-106, Mr. Jordan submitted declarations of two inmates who stated Mr. Jordan was placed in Cell A-106 on the evening of June 3, 1999, but prison staff mysteriously removed him in the middle of the night and took him somewhere else. He also submitted an inmate's declaration stating that from June 8 to June 13, 1999, he and Mr. Jordan were both housed in dry cells.

**\*\*2** With respect to Mr. Jordan's claim he received no notice of the reason for his placement in the cell, prison records establish he received two orders concerning his initial confinement. On June 3, at 3:45 p.m., while in the dry cell, he received a copy of the order advising him of his confinement pending an investigation into the assault, and then again, at 9:00 p.m., while in Cell A-106, he received a copy of an order stating he was being placed in administrative detention for assaulting another person and his as-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639                                                                 Page 4
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

sault raised concerns of further serious injuries, life threatening circumstances, and security issues for the institution. In addition, on June 4, 1999, one day after the murder incident, Mr. Jordan was advised of the crime he allegedly committed and his *Miranda* rights, after which he refused to sign a *Miranda* waiver and instead invoked his right against self-incrimination. As to his initial placement in the cell, prison officials explained the prison regulations in 28 C.F.R. § 541.22(a)(2) and (a)(3) permitted them to place an inmate who is under investigation for a criminal act in administrative detention and to refer such investigations, as they did here, to the Federal Bureau of Investigation.

Finally, concerning the conditions of the dry cell, Mr. Jordan claims he did not have a mattress or other furniture and slept on a blanket; the cell was unventilated and smeared with human feces, vomit, and other human waste; he received only sixteen ounces of iced water each weekday and thirty-two ounces of milk each weekend day; he was given merely a jar for urine and a plastic container for waste; and officials denied him socks and shoes, reading material, toiletries, and other basic hygiene products, other than tissue on request. In response, the prison officials **\*643** avowed the holding cells are routinely cleaned when an inmate leaves; Mr. Jordan's cell was personally inspected prior to his placement in it; and if a cell contained feces or vomit officials would not have placed him in the cell until someone cleaned it. They also explained that even though holding cells do not have a toilet or sink, they are routinely furnished with a mattress, sheets, and blanket; and Mr. Jordan was given a bed pan and container for bodily excrement. With respect to Cell A-106, where he was transferred later that day, the same officials explained it included a sink, toilet, and shower, and records show Mr. Jordan received daily visits from a physician's assistant, one hour of exercise each day, except for one day during a prison lock-down, and at least two showers during his stay.

### B. Federal Correctional Institution/Special Housing Unit Confinement

On June 13, 1999, Mr. Jordan was transferred to administrative segregation at the Florence Federal Cor-

rectional Institution Special Housing Unit as a holdover inmate based on spacial concerns, the investigation of his role in the murder, and his pending reclassification on security grounds. He remained at this facility in holdover status for almost nine months, until March 3, 2000.

**\*\*3** With respect to the conditions of his confinement, Mr. Jordan complained they consisted of restraints and restrictions more severe than others in administrative or disciplinary confinement, explaining he received sporadic indoor exercise "less than once per week," and prison officials severely restricted his ability to correspond, possess stationery, access reading materials from the library cart, and obtain personal property. In addition, Mr. Jordan claimed that in September 1999, Lieutenant Fels informed him they had completed the investigation of him and if he signed a waiver of his *Miranda* rights and confessed to the murder or told him who committed the offense, they would transfer him out of the special housing unit. Because he refused, claiming his innocence and inability to identify the offender, Mr. Jordan alleged officials left him to languish in administrative detention.

Prison officials countered Mr. Jordan remained in administrative detention in holdover status due to the pending investigation, the serious threat he posed to the safety and lives of others, and spacial considerations.[FN3] As to the conditions of his confinement, they pointed out he would have been afforded the same reading materials as other administrative inmates and, as indicated by prison records, he refused regularly-offered exercise periods. In addition, they explained inmates in the special housing unit are generally given the same privileges as inmates in the general population, provided such privileges are consistent with the security needs of the unit, and in Mr. Jordan's case he received the same privileges as the other inmates, except he was not permitted group recreation because of his security level. They also pointed out that during his almost nine-month administrative detention at the special housing unit he committed several infractions, including interfering with security devices, refusing to **\*644** obey an order, destroying government property, and possessing a dangerous weapon and threatening bodily harm. As one

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639                                                                                               Page 5
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

example, Mr. Jordan removed a stainless steel shower panel in his cell and used it to break the glass of his cell window and threaten staff. As a result of being found guilty of these offenses, he received a total of seventy-five days of disciplinary segregation as a sanction, during which time he lost commissary and property privileges.

> FN3. As to his placement ten days later in the special housing unit, prison officials explained an investigation is not considered closed until the inmate is criminally charged and/or the Federal Bureau of Investigation releases its primary jurisdiction allowing the Bureau of Prisons to complete its investigation and administratively discipline an inmate for homicide, and they could not determine Mr. Jordan's classification for permanent placement in a facility commensurate with his security needs until the criminal matter was resolved, which resulted in his holdover status in administrative detention.

C. Administrative Maximum Penitentiary Confinement

On March 3, 2000, Mr. Jordan received an administrative detention order for transfer to the Florence Administrative Maximum Penitentiary, which reiterated his placement in administrative detention stemmed from his reclassification pending the murder investigation and his possible prosecution; he remained a holdover inmate in that facility from March 4, 2000, until June 4, 2004.

In his verified complaint, Mr. Jordan stated officials were holding him indefinitely in prolonged solitary isolation without procedural due process because he received no hearing and no indication an investigation was pending for the purpose of keeping him in segregated confinement. He also alleged that, unlike him, other inmates under investigation remained in the general prison population. As to the conditions or restrictions associated with his confinement, Mr. Jordan alleged he lacked access to a radio or television at different times, his exercise was reduced to two and one-half hours per week, and the conditions of his confinement were similar to those in disciplin-

ary segregation or at the Florence control unit. However, he admitted he enjoyed access to educational and recreational programs, medical and psychological services, leisure and legal library services, and frequent interactions with staff.

**\*\*4** In response, prison officials pointed out all inmates in administrative maximum confinement are provided access to the following privileges: the commissary, institution programming, mental health and medical services, leisure and law libraries, five hours a week recreation, a hobby craft, telephone, correspondence, and visitors. They also explained these inmates enjoy opportunities to gain employment as a unit orderly; access to legal assistance from another inmate; and to interact with a case manager, unit counselor, unit manager, custody staff, and department heads. They avowed that while inmates in the facility are in single cells and cannot move about as in an open population facility, they are offered the same programs and afforded the same privileges as inmates in the general population, except that administrative detention inmates: 1) are allowed only one social call per month, while general population inmates are allowed two per month; and 2) do not receive the twelve hours recreation time general population inmates on group recreation status receive, but receive the same five hours of individual recreation that general population inmates on single recreation status receive. Prison officials by declaration stated Mr. Jordan was given the same privileges afforded other inmates at the administrative maximum confinement facility, which included the privileges and exceptions just described.

Prison officials also offered evidence explaining Mr. Jordan lost his privileges to a television as a result of disciplinary sanctions imposed for infractions completely independent from his administrative detention for investigation of the murder, including the loss of television and commissary privileges because staff found a razor blade between pages of a book in his cell **\*645** while he was housed at the administrative maximum prison. They provided further record evidence Mr. Jordan received an opportunity for five hours of exercise per week, which he frequently refused. Finally, they contradicted his general allegation he experienced restrictions similar to inmates in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639                                                                                          Page 6
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

disciplinary segregation or the control unit.<sup>FN4</sup>

> FN4. Specifically, they explained inmates in disciplinary segregation do not have a television set or radio, cannot participate in hobby craft or possess certain personal property, do not have commissary privileges, and may only receive one social telephone call every ninety days; and that inmates in the control unit have even fewer privileges than those in disciplinary segregation.

Prison officials also soundly countered Mr. Jordan's various claims that while in the administrative maximum facility he received no indication an investigation was pending for the purpose of keeping him in segregated confinement. Prison records show he received such notification on March 3, 2000, the day before his transfer to the administrative maximum prison, and again on June 5 and August 25, 2000, when officials denied his request for removal from administrative detention on his claim the investigation was completed; instead, prison officials explained a pending investigation was ongoing into his involvement in the homicide. Documents also show Mr. Jordan filed an administrative appeal requesting release from confinement because the homicide charges against him were "nullified," to which prison officials responded in November 2000 that the matter had been forwarded to the United States Attorney's office for review and possible prosecution for homicide. Prison officials also explained under 28 C.F.R. § 541.22(c)(2) no formal review, as required under § 541.22(c)(1), is necessary for holdover status inmates in administrative detention pending an investigation and, instead, designated staff are only expected to meet weekly with an inmate and to review his case on the record each week.

## II. Procedural Background

**\*\*5** In his *Bivens* action against the Florence prison officials, Mr. Jordan raised numerous claims concerning his placement in the three different confinement cells at the Florence facility. Mr. Jordan claimed his confinements triggered a Fifth Amendment liberty interest affording him due process by way of a hearing, which prison officials denied him,

and the conditions in his dry cell constituted cruel and unusual punishment under the Eighth Amendment. He also raised a retaliation claim based on his continued detention after he refused to waive his *Miranda* rights and confess or identify the murderer, and requested declaratory and injunctive relief.

After prison officials and Mr. Jordan filed various unsuccessful motions to dismiss and for summary judgment, the district court dismissed Mr. Jordan's dry cell Eighth Amendment claims based on his admission he failed to exhaust his administrative remedies.<sup>FN5</sup> With respect to the remaining Fifth Amendment due process, retaliation, and declaratory and injunctive relief claims, prison officials filed the instant summary judgment motion seeking qualified immunity, to which Mr. Jordan filed a cross-motion for summary judgment; the pleadings concentrated on whether a liberty interest was created triggering certain procedural due process **\*646** protections and, if so, whether the law was clearly established at the time of his confinement for the purpose of placing prison officials on notice of a constitutional violation.

> FN5. In his counseled brief, Mr. Jordan does not appeal the district court's dismissal of the Eighth Amendment claims but concentrates instead on his Fifth Amendment procedural due process claims dismissed in the instant summary judgment disposition.

The magistrate judge found Mr. Jordan remained in confinement ten days and accepted as true and uncontested his description of the conditions of the dry cell. On the other hand, the magistrate judge explicitly considered the prison officials' evidence regarding the conditions or restrictions of Mr. Jordan's placement in the other types of administrative detention from March 2000 to June 2004. After briefly considering the Supreme Court's *Sandin* decision and a number of Tenth Circuit published and unpublished cases, the magistrate judge determined neither Mr. Jordan's placement in dry cell confinement nor the other administrative detentions at issue created a liberty interest because their duration and restrictions fell within the range of confinement normally expected for one serving a federal prison sentence as compared with others in the same type of confinement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639                                                                                            Page 7
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

As a result, he found no constitutional violation and, therefore, did not reach the second prong of the qualified immunity defense as to whether the law was clearly established at the time of Mr. Jordan's confinement. Relying on our unpublished decision in *Moore v. Ham,* he also found the prison regulation on which Mr. Jordan primarily relied, 28 C.F.R. § 541.22(c), requiring periodic reviews and hearings, did not create a liberty interest. *See* 986 F.2d 1428, 1993 WL 5874, at *1 (10th Cir. Jan.12, 1993) (unpublished op.). Finally, the magistrate judge determined Mr. Jordan's retaliation claim lacked merit, given he failed to show that "but for" the retaliatory motive, his administrative detention would not have continued, and he further dismissed the remaining issue of declaratory and injunctive relief. Based on these determinations, the magistrate judge recommended granting summary judgment to the prison officials on their motion for summary judgment and dismissing Mr. Jordan's cross-motion. The district court accepted the recommendations of the magistrate judge and found in favor of the prison officials.

**\*\*6** Following the district court's resolution of the case, on May 19, 2004, a grand jury indicted Mr. Jordan on four counts associated with the June 3, 1999 murder of the other inmate. On June 4, 2004, he was transferred as a holdover inmate to a federal prison in Englewood, Colorado, for the purpose of producing him for prosecution during the pendency of his criminal trial. Sometime during Mr. Jordan's pending criminal investigation or prosecution, he brought a habeas corpus petition seeking injunctive and declaratory relief directing his release from administrative detention, which another panel from this court dismissed as moot based on Mr. Jordan's release from administrative detention following his indictment. *See Jordan v. Hood,* 117 Fed.Appx. at 32. On March 3, 2005, the federal district court assigned to Mr. Jordan's murder case granted his motion in limine to suppress the dying declarations of the murdered inmate. *See United States v. Jordan,* 2005 WL 513501, at \*\*1, 6. Nevertheless, based on other evidence, on August 9, 2005, a jury convicted Mr. Jordan on all four counts related to the murder of the other inmate. On August 19, 2005, Mr. Jordan was transferred back for housing at the Florence facility

as a holdover inmate pending reclassification, where, as of September 2005, his placement in administrative detention was reviewed on a weekly basis as required by 28 C.F.R. § 541.22(c)(2).

### III. Issues Presented On Appeal

The crux of Mr. Jordan's appeal rests primarily on his contention the district **\*647** court erred in determining the five-year duration of his administrative detention alone did not impose an atypical and significant hardship giving rise to a liberty interest and denial of his procedural due process rights. He also generally contends the conditions of his special housing unit and administrative maximum detentions were dissimilar to those of the general population, which, he suggests, is the applicable baseline in determining whether a liberty interest was created. Given his contentions a constitutional violation occurred, Mr. Jordan asks us to proceed to the "clearly established" prong of the qualified immunity defense, but suggests such a defense must fail because the officials in this case were on fair notice placing an inmate in administrative detention for five years without affording him due process, including the due process mandated by 28 C.F.R. § 541.22, was a constitutional violation. Mr. Jordan further suggests the district court erred in dismissing his retaliation claim and continues to request injunctive and declaratory relief from his continued placement in administrative detention.

In response, the prison officials suggest they are entitled to qualified immunity because Mr. Jordan has not shown the circumstances of his confinement or its duration created a liberty interest requiring due process protections, especially because the length of his detention was "justified" and legitimately stemmed from the pending murder investigation, security concerns, and past violent behavior warranting his segregation from the general prison population. They suggest the measure of an atypical or significant hardship should be based on a comparison of inmates in the same administrative detention and not, as Mr. Jordan claims, those in the general population. Nevertheless, they contend that, with the exception of one less visitor a month and less recreation time than some in the general population, his confinement was the same as the general population.[FN6]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639                                                                                   Page 8
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

FN6. Prison officials also suggest all of Mr. Jordan's claims should be dismissed under the total exhaustion rule announced in *Ross v. County of Bernalillo,* 365 F.3d 1181, 1188-90 (10th Cir.2004), because he failed to exhaust his Eighth Amendment dry cell claim. In his counseled reply brief, Mr. Jordan counters that the law at the time of his case did not require "total exhaustion"; the "total exhaustion" requirement was not imposed until five years after he filed his complaint; prison officials did not raise the "total exhaustion" issue during litigation; and the *Ross* decision permits dismissal without prejudice, which would merely lead to Mr. Jordan refiling the same lawsuit without the Eighth Amendment dry cell claim, resulting in resolution of the same due process issues before this court on appeal. We note Mr. Jordan incorrectly claims prison officials did not previously raise this issue during the district court litigation; instead, the record shows they clearly raised it early in litigation. Nevertheless, we find Mr. Jordan's other arguments persuasive, and for the purposes of judicial efficiency, we reject the prison officials' total exhaustion argument and proceed to the merits of the issues raised in this appeal.

IV. Discussion

A. Summary Judgment Standard of Review

**\*\*7** We review *de novo* the district court's summary judgment decision, examining the record and drawing all reasonable inferences in the light most favorable to the non-moving party, which in this case is Mr. Jordan. *See Palladium Music, Inc. v. EatSleepMusic, Inc.,* 398 F.3d 1193, 1196 (10th Cir.2005). Summary judgment is appropriate if the record shows there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Id.* (relying on Fed.R.Civ.P. 56(c) and **\*648***Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In reviewing summary judgment motions, we look at the parties' respective burdens. Concerning claims of individual liability,

movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670-71 (10th Cir.1998). If this initial burden is carried, the nonmovant may not rest solely on his pleadings, but must set out specific facts in support of his claim by reference to affidavits, deposition transcripts, or other exhibits incorporated therein. *Id. at 671.*

We have held a verified complaint stating facts admissible at trial and based on personal knowledge has the same force and effect as an affidavit for the purpose of responding to a motion for summary judgment. *See Conaway v. Smith,* 853 F.2d 789, 792 (10th Cir.1988). However, while we view the evidence and draw inferences in the light most favorable to the nonmoving party, that party must identify sufficient evidence, in its verified complaint or otherwise, which would require submission of the case to a jury. *See Adler,* 144 F.3d at 671-72 & n. 1. Even when a verified complaint is based on personal knowledge and sworn, it may be insufficient to create a triable issue of fact if it is nonspecific or otherwise nonresponsive, vague, conclusory, or self-serving. *See Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1019 (10th Cir.2002); *Adler,* 144 F.3d at 671-72 & n. 1; *Conaway,* 853 F.2d at 792; *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991).

We apply the burdens of the parties differently on claims of qualified immunity. *See Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1311 (10th Cir.2002). When a defendant raises the defense of qualified immunity on summary judgment, the burden shifts to the plaintiff to show 1) the official violated a constitutional or statutory right; and 2) the constitutional or statutory right was clearly established when the alleged violation occurred. *See id.* at 1311-12; *Applewhite v. U.S. Air Force,* 995 F.2d 997, 1000 (10th Cir.1993). In *Bivens* actions, like here, where prison officials have moved for summary judgment seeking qualified immunity and submitted declarations and evidence denying the allegations in appellant's verified complaint, the burden is on the inmate to respond to the particularized facts developed by those prison officials and to produce evidence tending to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prove every element of his claims, sufficient to require submission of each claim to a jury. In considering summary judgment determinations, we may affirm the district court's grant of summary judgment for any reason supported by the record. *See Baca v. Sklar,* 398 F.3d 1210, 1216 (10th Cir.2005).

### B. Absence of Material Dispute of Fact

**\*\*8** Before beginning any legal analysis, we must decide what, if any, material facts are in dispute and, therefore, whether summary judgment disposition on the legal issues presented was appropriate. For the following reasons, we conclude no dispute of material fact sufficient to overcome a summary judgment determination exists in this case.

First, because the prison officials' motion for summary judgment raised the issue of qualified immunity, Mr. Jordan maintained the burden to prove a constitutional violation occurred. While we view the evidence in the light most favorable to Mr. Jordan as the nonmoving party and generally consider his verified complaint stating personal knowledge of facts as an affidavit, his complaint does little to refute the substantial declaratory and documentary evidence presented by the prison**\*649** officials contradicting his own self-serving account of what happened. While he provided inmate declarations to rebut the overwhelming documentary evidence he remained in the dry cell for less than one day, he has not appealed the conditions of that confinement in his counseled briefs on appeal, but asks only that the duration of that confinement be included in the total five-year duration of his administrative detention. Thus, we will consider the initial ten days of his confinement only as part of his total five-year administrative detention. *See Giano v. Selsky,* 238 F.3d 223, 226 (2d Cir.2001) (considering total aggregate period of administrative detention, given two periods of confinement at different facilities were based on the same administrative rationale).

As to the rest of the evidence submitted by the prison officials, it is clear Mr. Jordan's verified complaint is insufficient to create a dispute of material fact as to the conditions and restrictions of his other confinement in administrative detention when compared

with his own admissions and the compelling documentary and regulatory evidence offered by the prison officials. Specifically, with respect to the first nine months of his detention in the special housing unit, prison officials showed Mr. Jordan received the same privileges as the general population, other than access to group recreation, and, as clearly shown by prison records, he refused regularly-offered non-group exercise sessions. As to the loss of certain commissary privileges during his nine-month stay at the special housing unit, prison officials, through documentary evidence, established Mr. Jordan committed several infractions during that period of time, for which he received a total of seventy-five days of disciplinary segregation, which included the loss of property and commissary privileges. Mr. Jordan's verified complaint does not sufficiently refute these facts.

Next, with respect to his administrative detention in the administrative maximum facility, Mr. Jordan alleged that, unlike him, other inmates under investigation remained in the general prison population, but he provided no actual examples of any of the inmates to whom he refers. As to the conditions or restrictions associated with his confinement in the administrative maximum facility, Mr. Jordan admitted he received many of the privileges afforded other inmates, and the only specific restrictions alleged involved his lack of access to a radio or television at different times and reduction of his exercise to two and one-half hours per week. However, he failed to counter the prison officials' compelling evidence establishing he received an opportunity for five hours of exercise per week, which he frequently refused, and lost his privileges to radio and television as a result of disciplinary sanctions imposed for various rule infractions, including keeping a razor blade in his cell. Mr. Jordan also failed to provide evidence to rebut the prison officials' evidence showing he and other inmates in administrative maximum confinement experienced restrictions and conditions comparable to those of the general population inmates, with the exception of one less social call per month and possibly seven hours a week less recreation time. Similarly, they contradicted his allegation he experienced restrictions similar to inmates in disciplinary detention or the control unit, to which Mr. Jordan provided no substantive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence to rebut.

****9** Finally, no dispute of fact exists over the length of time Mr. Jordan spent in administrative detention, which amounted to almost five years, or 1,825 days. Having found no genuine issue of material fact exists for a jury determination, we conclude summary judgment is an appropriate means of resolving Mr. Jordan's *Bivens* ***650** action and proceed to determining whether the prison officials, as the moving parties, are entitled to a judgment as a matter of law with respect to the liberty interest claimed.

C. Liberty Interest Principles

It is well established that lawfully incarcerated persons retain only a narrow range of protected liberty interests, *Abbott v. McCotter,* 13 F.3d 1439, 1442 (10th Cir.1994), and "[t]he Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed." *Sandin v. Conner,* 515 U.S. 472, 480, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (quotation marks and citation omitted). Generally, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence," and therefore, "administrative segregation is the sort of confinement ... inmates should reasonably anticipate receiving at some point in their incarceration" and does not involve an interest independently protected by the Due Process Clause. *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). However, under the Supreme Court's decision in *Sandin,* the government may create a liberty interest protected by the Due Process Clause which is generally limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484, 115 S.Ct. 2293. In determining whether the government has imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," as required by *Sandin,* we consider the conditions of confinement, including both its duration and degree of restrictions, as compared with other inmates. [FN7] *See Perkins v. Kan. Dep't of Corr.,* 165 F.3d 803, 809 (10th Cir.1999). In determining whether an atypical deprivation occurred, we acknowledge most of our decisions are unpublished, but conclude they lend some persuasive value on material issues not addressed in a published decision and assist in the disposition of the issues in this case. *See* 10th Cir. R. 36.3(B).

FN7. Another consideration in determining if a liberty interest is created is whether the detention increased the length or duration of the sentence imposed. *See generally Wilson v. Jones,* 430 F.3d 1113, 1120-21 (10th Cir.2005), *cert. denied,* --- U.S. ----, 127 S.Ct. 158, 166L.Ed.2d 253 (2006); *Gaines v. Stenseng,* 292 F.3d 1222, 1225 (10th Cir.2002) (relying on *Sandin,* 515 U.S. at 487, 115 S.Ct. 2293); *Jones v. Baker,* 155 F.3d 810, 812 (6th Cir.1998). However, that issue is not presented here.

When considering whether the conditions, duration or restrictions of confinement are atypical as compared with other inmates, this court has inconsistently used comparisons either with inmates in the same segregation or those in the general prison population. *See Hill v. Fleming,* 2006 WL 856201, at *4 (10th Cir. Apr.4, 2006) (unpublished op.) (citations omitted). The Supreme Court has recognized, without deciding the issue, that the circuit courts are split on which baseline comparison to use. *See Wilkinson v. Austin,* 545 U.S. 209, 125 S.Ct. 2384, 2394, 162 L.Ed.2d 174 (2005). In this circuit, regardless of which baseline we have utilized, this court "has never held the conditions, duration or restrictions of the detentions presented on appeal created a liberty interest...." *Hill,* 173 Fed.Appx. at 670.[FN8] Similarly, the ***651** majority of other circuits have also held no liberty interest arose in administrative detentions presented on appeal,[FN9] while a few others have rendered contrary decisions.[FN10] *Id.* at 670-71. Admittedly, none of these cases involved a detention lasting almost five years or 1,825 days. Nonetheless, we generally rely on their rudimentary principles and discussion to assist in our analysis of the issues presented in this case.

FN8. *Relying on Thomas v. Gunja,* 110 Fed. Appx. 74, 75-76 (10th Cir. Sept.14, 2004) (unpublished op.) (ruling transfer to a re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

strictive unit of another prison did not create atypical circumstance for purpose of creating a liberty interest); *Weatherall v. Scherbarth,* 208 F.3d 228, 2000 WL 223576, at \*\*1-2 (10th Cir. Feb.28, 2000) (unpublished op.) (finding no liberty interest in reclassification into administrative segregation); *Chappell v. McKune,* 201 F.3d 447, 1999 WL 1079618, at \*1 (10th Cir. Nov.30, 1999) (unpublished op.), *aff'g* 1999 WL 381802, at \*2 (D.Kan. May 26, 1999) (affirming district court decision on summary judgment which held inmate's lengthy stay of approximately 1000 days in administrative segregation was not atypical given inmate received all the privileges and incentives commensurate with his same security level); *Villarreal v. Harrison,* 201 F.3d 449, 1999 WL 1063830, at \*2 & n. 1 (10th Cir. Nov.23, 1999) (unpublished op.) (upholding summary judgment decision explaining two-year duration of administrative detention, even with conditions involving restricted telephone privileges and eating alone in cell, did not establish conditions dramatically different from those in the general population); *Blum v. Fed. Bureau of Prisons,* 189 F.3d 477, 1999 WL 638232, at \*3 (10th Cir. Aug.23, 1999) (unpublished op.) (considering disciplinary detention and concluding ninety-day confinement without store privileges, radio, and phone calls as enjoyed by other inmates in segregation did not differ in significant degree and duration to create a protected liberty interest); *Gutierrez v. Shanks,* 153 F.3d 727, 1998 WL 380958, at \*2 (10th Cir. July 9, 1998) (unpublished op.) (instructing in a motion to dismiss case that administrative segregation for over one year was not sufficient to distinguish confinement from that of other inmates for the purpose of creating a liberty interest); *Klein v. Coblentz,* 132 F.3d 42, 1997 WL 767538, at \*3 (10th Cir. Nov.19, 1997) (unpublished op.) (deciding 584-day administrative segregation failed to raise due process issue for summary judgment pur-

poses); *Jones v. Fields,* 104 F.3d 367, 1996 WL 731240, at \*\*1-2 (10th Cir. Dec.20, 1996) (unpublished op.) (holding fifteen-month administrative segregation did not impose atypical and significant hardship on inmate for purpose of summary judgment disposition).

FN9. *See, e.g. Jones v. Baker,* 155 F.3d at 812-13 (6th Cir.) (upholding administrative segregation over 900 days was not "atypical" under the Due Process Clause, given confinement was not much different than experienced by other inmates in segregation); *Beverati v. Smith,* 120 F.3d 500, 504 (4th Cir.1997) (determining six-month placement in administrative segregation was not atypical compared with the general prison population even though officials kept inmates in their cells except for three to four times each week; denied them outside recreation, educational, and religious services; warm or large portions of food, and clean clothing and bedding; and inmates' cells were infested with vermin, smeared with human feces and urine, flooded with water, and unbearably hot); *Griffin v. Vaughn,* 112 F.3d 703, 706-09 (3d Cir.1997) (concluding fifteen-month administrative segregation was within the "expected parameters of the sentence imposed on him," and that Pennsylvania regulations on such confinement did not deprive him of a liberty interest or entitlement to procedural due process); *Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) (concluding inmate's contention that Texas prison policies on administrative segregation created a protectable liberty interest lacked an arguable basis in law or fact and that "[i]n the wake of *Sandin,* ... administrative segregation, without more, simply does not constitute a deprivation of a constitutionally cognizable liberty interest").

FN10. *See, e.g., Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (stating, without analysis, it was "unaware of any data showing New York frequently removes prisoners

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639

191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))

**(Cite as: 191 Fed.Appx. 639)**

Page 12

from the general population for as long as ... 305 days"); *Williams v. Fountain, 77 F.3d 372, 374 n. 3 (11th Cir.1996)* (merely assuming that inmate suffered liberty interest deprivation based on disciplinary sanction of one year solitary confinement).

**\*\*10** [1] We commence with the conditions or restrictions which Mr. Jordan experienced in administrative detention, beginning with his stay in the administrative maximum facility. As previously mentioned, prison officials provided substantial **\*652** evidence inmates segregated in administrative maximum confinement experience restrictions and conditions comparable to those of general population inmates, with the exception of one less social call per month and possibly seven hours less recreation time per week, depending on the different recreation classes within the general population. Even if we use the general prison population as a baseline for comparison, these restrictions alone, or when considered together, do not impose an "atypical and significant hardship ... in relation to the ordinary incidents of prison life," as contemplated by *Sandin* or our own precedent. Similarly, Mr. Jordan has not shown the other nine months he spent in administrative detention at the special housing unit presented an "atypical and significant hardship" with respect to either the general population or those in the same administrative detention. In support of his position, Mr. Jordan points to a case in which the Supreme Court granted *certiorari* review and ultimately determined the government created a liberty interest subject to procedural due process protections when officials placed an inmate indefinitely in a super-max prison where almost all human contact was prohibited and which made him ineligible for parole. *See Wilkinson, 545 U.S. at 220-25, 125 S.Ct. at 2393-95.* While instructive, *Wilkinson* is not dispositive here, as the conditions of Mr. Jordan's administrative detention were obviously not as onerous, given 1) he admittedly had frequent contact with staff; 2) the length of his sentence was not affected by the administrative detention; and 3) his confinement was not indefinite but instead limited to the duration of the pending murder investigation.

We recognize on certain occasions the conditions or

restrictions Mr. Jordan experienced did differ from both prison populations, but these differences stemmed from temporary disciplinary measures resulting from Mr. Jordan's numerous infractions while in administrative detention. His attempt to mix these separate disciplinary incidents, which are not part of his *Bivens* action, into his arguments about the conditions or restrictions of his administrative confinement is unavailing. Based on the circumstances presented, we perceive no constitutional violation occurred with respect to the conditions or restrictions of Mr. Jordan's administrative confinement, and he has otherwise failed to meet his burden of establishing the officials violated a constitutional or statutory right for the purpose of overcoming their defense of qualified immunity.

[2] We next turn to the more egregious claim relating to the lengthy five-year or 1,825-day duration of Mr. Jordan's administrative detention to determine if it posed an atypical or significant hardship in relation to the ordinary incidents of prison life. Mr. Jordan claims the duration of his confinement alone created a liberty interest as a matter of law, while the prison officials argue it did not rise to an atypical hardship based on the pending murder investigation and continuing security risk he posed to other inmates and staff before and during that investigation.

**\*\*11** Clearly, we do not condone a murder investigation which takes almost five years, during which time an inmate is subjected to conditions which are atypical or pose a significant hardship. However, in this case, we have already determined the conditions or restrictions Mr. Jordan encountered did not pose the requisite *Sandin* atypical or significant hardship. Even if we considered the five-year duration of the confinement alone, this court has held certain prison actions which might impinge on an inmate's constitutional rights may be valid if they are reasonably related to legitimate penological interests. *See* **\*653***Frazier v. Dubois, 922 F.2d 560, 562 (10th Cir.1991).* Thus, in terms of administrative detention pending an investigation, we agree with the Sixth Circuit that "[i]t is not 'atypical' for a prisoner to be in segregation while his or her participation in violent conduct inside the prison wall is investigated," and it may be reasonable for prison officials "to make some

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adjustment in the conditions of ... imprisonment until a full and thorough investigation is completed." *Jones v. Baker,* 155 F.3d at 812-13 (holding that while the two and one-half-year duration of administrative confinement was atypical, segregation during investigation was not atypical and was justified pending investigation of prisoner for his participation in prison riot where he was implicated in the killing of a prison guard). *See also Skinner v. Cunningham,* 430 F.3d 483, 487 (1st Cir.2005) (concluding, in part, isolation of inmate in segregation was rational based on fact the inmate allegedly killed another inmate, and prison officials were waiting on Attorney General to conduct preliminary inquiry into the murder).

We have also determined that "[t]he due process rights of prisoners are subject to reasonable limitation or restriction in light of the legitimate security concerns of the institution," and therefore, " 'the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence.' " *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir.1996) (citation omitted).FN11 In this case, Mr. Jordan's administrative detention was a result of a justified, ongoing criminal investigation of which prison officials were aware. They were also cognizant of Mr. Jordan's significant history of violent and disruptive behavior; his heightened security risk, given he was accused of murder; and his threatening behavior on numerous occasions while in the contested administrative detention, including his use of a stainless steel shower panel to threaten staff and his possession of a hidden razor blade in his cell-obviously for means of using it as a weapon. Thus, while his administrative detention was longer than other instances this court has considered and arguably atypical in duration, the fact it was commensurate with ongoing security concerns and a pending investigation, during which time Mr. Jordan did not experience atypical conditions or restrictions, provides sufficient extenuating circumstances to convince us no liberty interest was implicated.

> FN11. *See also Griffin,* 112 F.3d at 705, 708 (determining stay of many months in administrative detention pending investigation into inmate's alleged rape of female prison guard

fell within prison officials' security risk considerations and was not uncommon); *Jones v. Fields,* 1996 WL 731240, at *2 (stating "[a]dministrative segregation due to legitimate concerns about [the inmate's] escape history and prison security did not impose an atypical and significant hardship ... in relation to the ordinary incidents of prison life"); *Duarte v. Henman,* 986 F.2d 1427, 1992 WL 403128, at *1 (10th Cir. Dec.29, 1992) (unpublished op.) (holding prisoners have very limited due process rights when prison officials address prison security issues in case where inmate was placed in administrative detention pending investigation of his planned escape attempt).

### D. Application of 28 C.F.R. § 541.22

**\*\*12** [3] The only question left regarding Mr. Jordan's administrative detention concerns his argument the regulations in 28 C.F.R. § 541.22 created a liberty interest triggering procedural due process protections officials denied him. Section 541.22 provides, in relevant part:

(c) Review of Inmates Housed in Administrative Detention.

(1) *Except as otherwise provided in paragraphs (c)(2)* and (c)(3) of this section,**\*654** the Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days. The inmate appears before the SRO at the hearing unless the inmate waives the right to appear. A waiver may be in writing, signed by the inmate, or if the inmate refuses to sign a waiver, it shall be shown by a memorandum signed by staff and witnessed by a second staff member indicating the inmate's refusal to appear at the hearing. Staff shall conduct a psychiatric or psychological assessment including a personal interview, when administrative detention continues

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639

191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))

**(Cite as: 191 Fed.Appx. 639)**

beyond 30 days. The assessment, submitted to the SRO in a written report, shall address the inmate's adjustment to surroundings and the threat the inmate poses to self, staff and other inmates. Staff shall conduct a similar psychiatric or psychological assessment and report at subsequent one-month intervals should detention continue for this extended period. Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection (see § 541.23), or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the SRO. Provided institutional security is not compromised, the inmate shall receive at each formal review a written copy of the SRO's decision and the basis for this finding. The SRO shall release an inmate from administrative detention when reasons for placement cease to exist.

*(2) The Warden shall designate appropriate staff to meet weekly with an inmate in administrative detention when this placement is a direct result of the inmates's holdover status. Staff shall also review this type of case on the record each week.*

(Emphasis added.) Obviously, in viewing § 541.22(c) in its entirety, subsection (c)(1) requires a formal procedural process involving periodic hearings and reviews, while subsection (c)(2), which pertains to inmates in holdover status, requires only informal reviews. Keeping these distinctions in mind, we consider the applicable law on whether such provisions establish a liberty interest and what, if any, procedural due process must be afforded.

**\*\*13** Our discussion begins with the law prior to *Sandin.* In the Supreme Court's earlier *Hewitt* decision, a deprivation analysis of an inmate's liberty interest focused on the language of the state or federal prison regulations and whether it was mandatory, as opposed to the subsequent *Sandin* requirement that courts look to the nature of the deprivation experienced by the inmate. *See Beverati,* 120 F.3d at 503 n. 3. It is important to note that under *Hewitt* and prior to *Sandin,* "the analysis of whether a prisoner was deprived of a liberty interest focused not on the nature of the deprivation experienced by the prisoner, but on

the language of the applicable prison regulations and whether such language was 'mandatory.' " *Id.* (relying on *Sandin,* 515 U.S. at 479-81, 115 S.Ct. 2293). "The Supreme Court mandate since *Sandin* is that henceforth we are to review ... liberty interest claims arising from prison conditions**\*655** by asking whether the prison condition complained of presents 'the type of atypical, significant deprivation in which a State might conceivably create a liberty ... interest.' " *Cosco v. Uphoff,* 195 F.3d 1221, 1224 (10th Cir.1999) (quoting *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293). The Supreme Court in *Sandin* explained the problem in applying the regulation language method, stating "[b]y shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." 515 U.S. at 481, 115 S.Ct. 2293. Nevertheless, since its decision in *Sandin,* the Supreme Court has acknowledged "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin ...,"* but explained, "[a]fter *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves." *Wilkinson,* 545 U.S. at 220-24, 125 S.Ct. at 2393-94.

Before further reviewing the regulation on which Mr. Jordan relies, it is also important to note that even before *Sandin,* the *Hewitt* Court made it clear administrative segregation of an inmate pending completion of an investigation of charges against him or for security reasons does not require elaborate procedural protections, but merely informal, nonadversary evidentiary review, such as notice of the charges against him and an opportunity to present his views, even if by written statement. *See Hewitt,* 459 U.S. at 475-77, 103 S.Ct. 864. Relying on *Hewitt,* we similarly determined "[a]dministrative segregation of an inmate, pending completion of an investigation of disciplinary charges against him, does not require elaborate procedural protections," but requires only the inmate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))

**(Cite as: 191 Fed.Appx. 639)**

be given notice of the charges against him, an opportunity to present his story, and the reasons for the administrative detention. *Crispwell v. Gunter,* 5 F.3d 545, 1993 WL 372689, at *2 (10th Cir. Sept.24, 1993) (unpublished op.). *Hewitt* further instructed that whether a prisoner remains a security risk will depend on factors relating to the particular prisoner and the officials' general knowledge of prison conditions and tensions, and, similarly, the decision to continue confinement of an inmate pending an investigation may depend on the progress of the investigation. 459 U.S. at 477 n. 9, 103 S.Ct. 864.

**\*\*14** With this in mind, we turn specifically to § 541.22. Prior to the Supreme Court's decision in *Sandin,* this court rendered an unpublished decision in *Moore v. Ham,* in which we determined § 541.22 did not grant inmates a liberty interest in remaining in the general prison population and, alternatively, that the government did not deny the inmate in question due process under § 541.22, given the inmate received the required three-day review and was returned to the general prison population within three days. 1993 WL 5874, at *1. Since entry of that decision and the Supreme Court's decision in *Sandin,* this court has not directly addressed the liberty and due process interests afforded by 28 C.F.R. § 541.22(c) in a published opinion. Instead, in an unpublished decision, we declined to consider an inmate's contentions § 541.22 created a liberty interest or afforded due process protections and held "a [prison official's] failure to adhere to administrative regulations does not equate to a constitutional violation." *See* **\*656***Malik v. Kindt,* 76 F.3d 393, 1996 WL 41828, at *2 (10th Cir. Feb.2, 1996) (unpublished op.) (quoting *Hovater v. Robinson,* 1 F.3d 1063, 1068 n. 4 (10th Cir.1993)). In another unpublished case, this court generally determined "[n]either the Due Process Clause of the Constitution, nor the federal regulations governing placement of inmates in administrative detention, provide an inmate with a liberty interest in remaining in the general prison population." *Villarreal,* 1999 WL 1063830, at *2. At least one circuit court has agreed with our assessment. In *Crowder v. True,* the Seventh Circuit applied the principles in *Sandin* to conclude periodic review of administrative detention placement under §

541.22(c) bears none of the pivotal characteristics of an atypical and significant hardship on prisoners in relation to the ordinary incidents of prison life and does not constitute a dramatic departure from the basic conditions or duration of prisoners' sentences, and therefore, it does not create a constitutionally protected liberty interest.<sup>FN12</sup> 74 F.3d 812, 815 (7th Cir.1996).

> FN12. We find unpersuasive the pre-*Sandin* reasoning by the Second Circuit in *Tellier v. Fields,* which focused almost exclusively on the mandatory language of § 541.22(c)(1), rather than the nature of the deprivation, to determine the inmate's liberty interest was violated. 280 F.3d 69, 80-83 (2d Cir.2000). For the same reasons, we find the Eleventh Circuit's decision in *Magluta v. Samples* equally unpersuasive. 375 F.3d 1269, 1280-82 & n. 8 (11th Cir.2004).

In this case, it is important to note Mr. Jordan became a holdover inmate, to which the formal procedural requirements in 28 C.F.R. § 541.22(c)(1) do not apply. Instead, the regulations applicable to Mr. Jordan as a holdover status inmate required only an informal weekly review. *See* 28 C.F.R. § 541.22(c)(2). Even if the formal review and hearing requirements of § 541.22(c)(1) applied, this court has consistently held, albeit by unpublished opinion, that § 541.22 creates no liberty interest under either pre- or post-*Sandin* principles; furthermore, under these decisions, officials would not have been on notice of clearly established law requiring formal procedural review under § 541.22.

Alternatively, even if we apply the minimal procedural requirements articulated in *Hewitt* for administrative detentions pending investigation, it is clear Mr. Jordan received the requisite informal, nonadversary evidentiary review during his criminal investigation. First, Mr. Jordan received notice of the charges against him as well as the reasons for his placement in administrative detention within the first twenty-four hours. While it is not clear whether Mr. Jordan received an immediate opportunity to provide an oral or written statement contesting his administrative detention, a grievance procedure was immedi-

191 Fed.Appx. 639                              Page 16
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))
**(Cite as: 191 Fed.Appx. 639)**

ately available to him, which he utilized at least seventeen times prior to the murder on June 3, 1999, including on August 20, 1996, to contest his placement in administrative detention and on June 19, 1998, to contest his alleged denial of visitation privileges while in similar special housing unit holdover status. *See* 28 C.F.R. §§ 542.10, 542.13, 542.14, and 542.15. Nevertheless, he did not file a written statement contesting his placement in administrative detention until February 15, 2000, when he filed his initial grievance, after which he filed at least eight more grievances on the same grounds, which were subsequently denied. The record clearly shows the prison officials' decisions to deny his grievances and continue his confinement were based, in large part, on the pending investigation and his security risk to other inmates and staff. Thus, even assuming a liberty interest was created by placing Mr. Jordan in administrative segregation, he was extended***657** minimum due process when he received notice of the charges supporting his segregation, had an opportunity to present his story, and was given reasons for the detention. Under these circumstances, Mr. Jordan has not met his burden of showing a constitutional or statutory right was established by means of statute, regulation, or under other due process considerations; nor has he shown prison officials should have been aware of any clearly established law requiring he receive a more formal means of procedural due process beyond the informal procedural due process described in *Hewitt* or any of the subsequent requirements articulated in *Sandin* or by this court.

### E. Retaliation Claim

**\*\*15** [4] Least convincing of all of Mr. Jordan's arguments is his retaliation claim. While we acknowledge that "prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights," an inmate must demonstrate the action was taken because of the exercise of his constitutional rights. *Peterson v. Shanks,* 149 F.3d 1140, 1144 (10th Cir.1998) (quotation marks and citation omitted). Consequently, to prevail on his retaliation claim, Mr. Jordan "must prove that 'but for' the retaliatory motive, the incidents to which he refers ... would not have taken place." *Id.* (quotation marks and citation omitted). In this case, the record

clearly establishes his continued administrative detention was based on his pending criminal investigation and prosecution for the June 3, 1999 murder of another inmate, as well as justified security concerns. As the district court determined, Mr. Jordan has not shown that "but for" his refusal to confess to the crime or implicate another individual, he would not have remained in administrative detention.

### F. Injunctive and Declaratory Relief

Finally, this court previously held as moot Mr. Jordan's request for injunctive and declaratory relief from administrative detention because of his indictment and transfer to another prison pending his criminal prosecution for the murder of the other inmate. *See Jordan v. Hood,* 117 Fed. Appx. at 32. We decline to address this issue a second time on appeal. The fact Mr. Jordan is currently in administrative detention following his trial and conviction does not warrant our review, given it is not the same administrative detention pending his murder investigation which he contested in the *Bivens* complaint before us.

### V. Conclusion

For the reasons articulated herein, we **AFFIRM** the district court's grant of summary judgment to the Appellees. While this panel previously granted Appellees' Motion to Further Supplement the Record, filed September 14, 2005, we now further **GRANT** the following motions:

1) Appellees' Motion to Supplement Record, filed July 20, 2004;

2) Appellees' Motion to Further Supplement Record, filed September 12, 2005; and

3) Appellant's Pro Se Motion to Further Supplement the Record on Appeal, filed October 14, 2005.

C.A.10 (Colo.),2006.
Jordan v. Federal Bureau of Prisons
191 Fed.Appx. 639, 2006 WL 2135513 (C.A.10 (Colo.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



76 F.3d 393                                                                                                      Page 1
76 F.3d 393, 1996 WL 41828 (C.A.10 (Okla.))
**(Cite as: 76 F.3d 393)**

**H**

Malik v. Kindt
C.A.10 (Okla.),1996.
NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.(The Court's decision is referenced in a "Table
of Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA10 Rule 36.3 for
rules regarding the citation of unpublished opinions.)
   United States Court of Appeals, Tenth Circuit.
   Abdul-Jabbor MALIK, Plaintiff-Appellant,
                 v.
Warden Tom R. KINDT; Associate Warden Calbone,
        Defendants-Appellees.
           **No. 95-6057.**

          Feb. 2, 1996.

Before PORFILIO, KELLY, and LUCERO, Circuit
Judges.

    ORDER AND JUDGMENT FN1

> FN1. At the parties' request, the case is un-
> animously submitted without oral argument
> pursuant to the applicable rules. This order
> and judgment is not binding precedent, ex-
> cept under the doctrines of law of the case,
> res judicata, and collateral estoppel. The
> court generally disfavors the citation of or-
> ders and judgments; nevertheless, an order
> and judgment may be cited under the terms
> and conditions of 10th Cir. R.
> 36.3.LUCERO, Circuit Judge.

**\*1** Plaintiff Abdul-Jabbor Malik, a federal prisoner,
appeals from a judgment dismissing his action
against defendants Tom R. Kindt and Sam Calbone
brought pursuant to *Bivens v. Six Unknown Named
Agents,* 403 U.S. 388 (1971). We affirm in part, re-
verse in part, and remand for further proceedings.

Between February 9 and March 24, 1994, plaintiff
was placed in the Special Housing Unit (SHU) at the
federal prison at El Reno, Oklahoma, while in transit
from one federal prison to another. He was confined
in the cell for twenty-three hours a day and was hand-
cuffed whenever he left his cell. He was not permit-

ted to attend Friday night Muslim religious services.

Plaintiff commenced this action, alleging his confine-
ment in the SHU violated various constitutional
rights. Defendants filed a special report. They moved
to dismiss on the ground, inter alia, that they were en-
titled to qualified immunity. A magistrate judge re-
commended that the motion to dismiss be treated as a
motion for summary judgment and that it be granted
because defendants were entitled to qualified im-
munity. Following a de novo review, the district
court adopted the magistrate judge's recommendation
and granted defendants' motion for summary judg-
ment.

Qualified immunity is a question of law that we re-
view de novo. *Liebson v. New Mexico Corrections
Dep't,* No. 94-2210, 1996 WL 1125, at \*1 (10th Cir.
Jan. 2, 1996). We "first determine whether the
plaintiff has asserted a violation of a constitutional
right at all." *Id.* (quotation omitted). We "then de-
termine whether that right was clearly established so
that reasonable officials in defendants' situation
would have understood their conduct violated that
right." *Id.* When qualified immunity is raised, the
plaintiff must come forward with facts showing that
the defendant's conduct violated the law and that the
law was clearly established at the time of the alleged
violation. *Gehl Group v. Koby,* 63 F.3d 1528, 1533
(10th Cir.1995).

Plaintiff first argues that he was entitled to notice and
a hearing before there was a major change in the con-
ditions of his confinement, specifically, his place-
ment in the SHU. Plaintiff was placed in the SHU as
a consequence of being in administrative detention.
He was in administrative detention because he was in
holdover status and was classified as a high security
inmate with maximum custody. R. Vol. I, doc. 10, at-
tach. at 4.

"The Due Process Clause standing alone confers no
liberty interest in freedom from state action taken
within the sentence imposed." *Sandin v. Conner,* 115
S.Ct. 2293, 2298 (1995)(quotation omitted). "[T]he
transfer of an inmate to less amenable and more re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 F.3d 393                                                                                              Page 2
76 F.3d 393, 1996 WL 41828 (C.A.10 (Okla.))
**(Cite as: 76 F.3d 393)**

strictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms,* 459 U.S. 460, 468 (1983). Therefore, "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration," and does not involve an interest independently protected by the Due Process Clause. *Id.*

**\*2** While the government may create liberty interests protected by the Due Process Clause, these interests are generally limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 115 S.Ct. at 2300. However, the Court indicated that confinement in administrative segregation was not the type of "atypical, significant deprivation" in which a liberty interest might be created. *Id. at 2301.* We therefore conclude the Due Process Clause does not require that plaintiff be provided with notice and a hearing prior to his placement in the SHU. Defendants were entitled to qualified immunity on this claim.

Plaintiff points to various provisions of 28 C.F.R. 541.22 that he claims entitled him to certain procedures which were not provided. However, a *Bivens* action "must be founded upon a violation of constitutional rights," *Arcoren v. Peters,* 829 F.2d 671, 676 (8th Cir.1987), *cert. denied,* 485 U.S. 987 (1988), and "a failure to adhere to administrative regulations does not equate to a constitutional violation," *Hovater v. Robinson,* 1 F.3d 1063, 1068 n. 4 (10th Cir.1993). Plaintiff was not entitled to relief on this claim.

Plaintiff also contends that his rights under 42 U.S.C.2000bb, the Religious Freedom Restoration Act of 1993, were violated when he was not allowed to attend Muslim services on six occasions while housed in the SHU. The district court did not address this issue; defendants request that we remand so that it may do so. We agree that a remand for this purpose is appropriate.

Plaintiff contends his First Amendment rights to freedom of association and speech were violated when he was restrained in his cell for twenty-three hours a

day. Presumably plaintiff's contention is that he was not permitted to socialize with other inmates when confined in his cell. However, he admits he had a cellmate for one week out of his confinement. R. Vol. I, doc. 11 at 16.

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). The Court has recognized that, to accommodate prison institutional needs and objectives, it is necessary to place major restrictions on prisoners' First Amendment rights. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 129-30 (1977). First Amendment associational rights may be curtailed whenever prison officials, exercising informed discretion, reasonably conclude that such associations "possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment." *Id.* at 132. "[P]rison administrators are to be accorded wide-ranging deference in adopting and executing policies and practices," and, absent substantial evidence in the record indicating they exaggerated their response to considerations of order, discipline, and security, we will ordinarily defer to their judgment. *Ramos v. Lamm,* 639 F.2d 559, 579 (10th Cir.1980)(quotation omitted), *cert. denied,* 450 U.S. 1041 (1981).

**\*3** Plaintiff has pointed to no evidence in the record showing that defendants exaggerated their response to these considerations by restricting his ability to socialize with other inmates the twenty-three hours a day that he was confined in his cell without a cellmate. We therefore conclude defendants were entitled to qualified immunity on his First Amendment claim.

Plaintiff's next claim is that being handcuffed every time he left his cell to go to the shower or recreation yard, and being kept in his cell twenty-three hours a day, constituted a seizure in violation of the Fourth Amendment. As the district court recognized, "the Fourth Amendment has no applicability to a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 536 (1984). However, traditional Fourth Amendment principles still apply when a personal body search of a prisoner

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

76 F.3d 393                                                                                    Page 3
76 F.3d 393, 1996 WL 41828 (C.A.10 (Okla.))
**(Cite as: 76 F.3d 393)**


is challenged. *Dunn v. White,* 880 F.2d 1188, 1191 (10th Cir.1989), *cert. denied,* 493 U.S. 1059 (1990).

Plaintiff is challenging neither a search of his cell, nor a personal body search. He has cited no case law establishing that use of handcuffs on a prisoner, or his placement in a cell for a certain length of time, constitutes a "seizure" for Fourth Amendment purposes. Certainly he has not shown that the law was clearly established in February and March of 1994 that such measures constituted a seizure. Defendants are entitled to qualified immunity on the Fourth Amendment claim.

The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED in part, REVERSED in part, and the case is RE-MANDED for further proceedings consistent with this order and judgment. The mandate shall issue forthwith.

C.A.10 (Okla.),1996.
Malik v. Kindt
76 F.3d 393, 1996 WL 41828 (C.A.10 (Okla.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.